UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RONIE DAVIS,

       Petitioner,

                                      Case No. 13-13610
v.                                    Honorable Laurie J. Michelson

LLOYD RAPELJE,

       Respondent.

---

**OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND DENYING CERTIFICATE OF APPEALABILITY**

---

In 2010, Petitioner Ronie Davis was charged with, among other offenses, armed robbery. On the day his trial was set to begin, he chose to plead guilty. Davis now says that he did not really choose: he either had to go to trial with a constitutionally ineffective attorney or accept a plea deal. He further claims that his trial counsel coerced him into accepting the plea. Davis maintains that the involuntary nature of his plea warrants a writ of habeas corpus. Having reviewed Davis's petition, Warden Lloyd Rapelje's response, Davis's reply, and the state-court record, the Court concludes that the state courts reasonably concluded that Davis's trial counsel was not constitutionally ineffective. The state courts also reasonably concluded that Davis's counsel did not coerce him into pleading guilty. The Court will thus deny Davis's petition.

## I.

### A.

On March 26, 2010, Davis and his brother, Brian Davis, encountered Kevin Kurkowski bringing home groceries. (Dkt. 9-8, Plea Hr'g Tr. at 8.) The pair followed Kurkowski into the house. (*Id.*) Once there, Davis and his brother used a shotgun to intimidate Kurkowski and

Kurkowski's aunt, Audrey Lach, who was also in the house. (*Id.* at 8-9.) Davis and his brother stole items from the home and then took the two victims to Brian's car. (*Id.* at 9.) For the next hour-and-a-half, Davis and his brother drove the victims to ATMs, forcing them to make withdrawals and give them the cash. (*Id.* at 10; *see also* Dkt. 9-2, Prelim. Exam Tr. vol. I at 13.) After leaving Kurkowski and Lach someplace in Detroit (but with money for a phone call), the brothers returned to the victims' house and stole their car. (Plea Hr'g Tr. at 10; Prelim. Exam Tr. vol. I at 16.)

At least that was Davis's version on September 20, 2010, the day Davis's trial was set to begin and the day he pled guilty to armed robbery (Michigan Compiled Laws § 750.529), first-degree home invasion (§ 750.110a), carjacking (§ 750.529a), and possession of a firearm during the commission of a felony (§ 750.227b). In exchange for Davis's admission that he committed these four offenses, the prosecutor agreed to dismiss four other charges and further agreed that Davis should be sentenced to concurrent 11 to 40 year terms along with a mandatory consecutive 5-year sentence for the firearm charge.

Attorney Brian Gagniuk represented Davis at the time of his plea deal. (Plea Hr'g Tr. at 1.) Gagniuk had been appointed just two weeks earlier. (*See generally*, Dkt. 9-7, Sept. 3, 2010 Hr'g Tr.) Prior to that, Davis had been represented by another attorney, Jon Posner. (*See generally id.*)

On October 5, 2010, the state trial court sentenced Davis pursuant to the terms of the plea agreement. Davis is currently serving his sentence at Saginaw Correctional Facility in Freeland, Michigan. (*See* Dkt. 9, Notice of R. 5 Materials at 1.)

**B.**

Two years after his plea, on October 12, 2012, Davis filed a motion with the trial court to withdraw his plea on the basis of ineffective assistance of trial counsel.

On December 5, 2012, the trial court held a *Ginther* hearing on the motion, *see People v. Ginther*, 390 Mich. 436, 212 N.W.2d 922 (1973), which allowed Davis to develop the record on his ineffective-assistance-of-counsel claim. (*See generally*, Dkt. 9-11, Ginther Hr'g Tr.) Davis's new attorney, Susan Walsh, provided an opening statement outlining Davis's basis for withdrawing his plea. She explained that Davis believed he was innocent, and "from the very beginning" wanted to go to trial. (*Id.* at 4.) Walsh told the judge that the photo taken from the ATM machine that had been used to identify Davis was "too grainy" to make out who was pictured, and, thus, the police lacked probable cause for his arrest. (*Id.*) Walsh, referencing Davis's belief that Kurkowski told police that the perpetrator (later identified as Davis) had facial hair, also explained that a mug shot, had it been obtained by Davis's trial counsel, would have shown Davis without facial hair. (*Id.* at 5; Petition at 37; Prelim. Exam Tr. vol. I at 29, 35.) She recounted how Davis had not been arraigned within 72 hours, and that this delay led to a third co-defendant, Brian's girlfriend, "com[ing] in and mak[ing] a statement." (*Id.*) Davis "told all these things to his first [trial] attorney, Mr. Posner, and Mr. Posner never went forward and, and, collected information that [Davis had] requested." (*Id.* at 6.) Walsh continued: "Then Mr. Gagniuk was finally appointed two weeks prior to the trial date. And because of this . . . Mr. Davis, just felt like, well, I'm just gonna have to try to get the best plea deal that . . . I can." (*Id.*)

Gagniuk then testified at the *Ginther* hearing. When asked whether he had noticed that a motion for illegal arrest and suppression of evidence was pending, Gagniuk's testimony was equivocal: "I know that there [apparently gesturing to the motion] is at least in my file—Mr.

3

Posner gave me all of his information and discovery, and I, I do note that there is in my file. . . . I honestly I cannot recall whether or not I looked through [the motion], did anything more with it. Obviously I didn't continue to argue that." (*Id.* at 9.) Gagniuk "possibly" discussed that decision with Davis, but was not able to recall. (*Id.*)

As for the ATM photo, Gagniuk said that the prosecutor in Davis's case, Scott Ehlfeldt, had shown him "color photos," and that while he had "black and whites" in his file folder, "I know I saw better than what I have in my photos from [the prosecutor] Mr. Ehlfeldt." (Ginther Hr'g Tr. at 21.) Gagniuk explained, "I honestly, I, I can't remember exactly. I, I've see[n] many of 'em. I try many cases. I cannot tell you exactly whether I thought they were a perfect photo, a grainy photo. I thought they were good enough for a jury to think that it very well could be Mr. Davis." (*Id.*)

Gagniuk was also asked about the delay in Davis's arraignment. Gagniuk could not recall if Davis had told him that he had not been arraigned for four days or that Brian's girlfriend confessed prior to Davis's arraignment. (Ginther Hr'g Tr. at 18.) Gagniuk explained,

> that was one piece of ten good pieces of evidence against him. And any time I find that there's two or three or four pieces of good evidence, sometimes I might not completely pay attention to something else. I know with or without that, whether I argued it or not, during trial I would have probably run a motion in limine at some point. But that was . . . only one piece of ten good pieces evidence against him.

(*Id.* at 19.)

Regarding the mug shot that allegedly would have shown Davis without facial hair, Gagniuk stated that he could not recall whether Davis told him about the photo. (Ginther Hr'g Tr. at 19.) When asked if he knew that the other perpetrator had facial hair, Gagniuk responded, "At the time I'm sure I did. Like I said[,] . . . I prepped this thing completely for trial. Today I, I don't recall." (*Id.*)

4

Gagniuk also testified, "I also know that my file was completely prepped and ready to go":

> And what I do when I prepare for a trial, especially if I'm the second attorney, which I routinely am, is I will go through each and everything that has been transcribed and I transcribe it in my own hand. So if it was a hundred pages, I'm able to turn it into 20 so I can easily identify and question and do, and my file is covered with all of that. So I was ready to try this case as in I transcribed everything, went through everything. And if there was going to be a trial, I could have gone through whether it was a blue hat or a red hat on trial day and throughout all of this.

(Ginther Hr'g Tr. at 10.) Gagniuk stated that he "absolutely" relayed his preparedness to Davis. (*Id.* at 11.)

Finally, regarding the plea, Gagniuk explained that he could not recall exactly what he told Davis, "but I knew that he had a very strong case against him." (Ginther Hr'g Tr. at 8.) He explained that before trial, there had been plea negotiations on the primary charges "along the lines of 13 or 14 years" but Davis was seeking 10 years. (*Id.*) "And I recall going upstairs with the prosecutor, Scott Ehlfeldt, and trying to get that number. And I believe we came down with 11 years which was better than what we had started with." (*Id.*) At the conclusion of his testimony, Gagniuk stated, "I looked at this and I told him you got a tough ass case. Do what you want. Here's your numbers. I can get you 11 on the primary. Take it or leave it, and he took it." (*Id.* at 22.)

Next, Davis testified at the *Ginther* hearing. Davis said he was innocent. (Ginther Hr'g Tr. at 23.) He stated that he had "tried to explain to [Posner] about my 72 hour rule. That about 72 hour rule that I felt I was held in jail for over 72 hours without being charged or arraigned." (*Id.* at 24.) But Posner allegedly said, "what would be the prejudice of them letting you go?" (*Id.*) Davis continued, "I then explained to him about my fourth degree habitual offense; that I was not a fourth degree offender. Counsel then told me, okay, he'd do something about it. But when we

5

came in, there was nothing ever done." (*Id.*) Davis stated that Gagniuk's testimony that he

wanted to plead was false:

> That was not true what Mr., uh, Gagniuk said. I didn't never ask him for a cop.
> Each time he came in there, I told him I was going to trial. It was my little
> brother, Brian Davis, that consistently kept speaking on a cop. I, I never asked
> him for a cop. He came to me on the day of the trial and the evidential hearing
> and stated to me that the negotiation was 11 plus five. And then he stated to me
> again if I didn't go right, if I didn't take it right now, and if I want to [do] the
> evidential hearing, it would go up two years. And then he went so on so when -- if
> I went to trial and decided to take a plea then, and it'll be five plus 15. That's
> what was told me—to me. . . . He also told me that if I didn't take the cop, they
> was gon' force my little brother to go to trial and give him 50 years to life. Well,
> he was facing that.

(*Id.* at 26.) Davis explained that he took the plea "because first I didn't see no other alternative

that my counsel was gon' work for me. So I was just like, well, here we go. Also, that he just told

me that Brian was gon' face a lot of time, face a lot of time." (*Id.* at 27-28.)

On cross examination, Davis admitted he had lied at the plea hearing when he

acknowledged that no one had forced him to take the plea. (Ginther Hr'g Tr. at 33.) Davis was

also asked: "when the prosecutor went through a series of questions [at the plea hearing] that

took up five pages of a transcript regarding your actions in this case, and every time he asked

you [']did you do that['], you said [']yes['], each of those was a lie?" (*Id.*) Davis agreed that each

was. (*Id.*)

The state trial court rejected Davis's claim of ineffectiveness of trial counsel and denied

Davis's motion to withdraw his plea. Regarding Davis's theory that the delay in his arraignment

caused Brian's girlfriend to go to the police station where a coercive atmosphere led to her

statement, the court reasoned, "I'm not sure there's any authority to support that rather

extravagant complaint" and "there was nothing to be done about that by Posner." (Ginther Hr'g

Tr. at 39-40.)

6

Regarding Gagniuk having insufficient time to prepare for trial, the state court found that it had

> fully explained to Mr. Davis the possible pitfall of his going to trial with a lawyer that had only just been appointed to the case, and he accepted that. He very much wanted Mr. Posner off the case because he [didn't] think Mr. Posner did certain things that he expected Mr. Posner to do, although I think Mr. Davis' expectations on both counsel frankly are completely unreasonable and misguided and unintelligent.

(*Id.* at 40.) The state court further found that "it appear[ed]" that Gagniuk "was fully prepared to try the case two weeks from the day he was appointed." (*Id.*)

As for Davis's testimony, the trial court found that Davis had "virtually no credibility at all":

> [W]e have the inescapable fact that Mr. Davis went under oath and made out an exquisitely detailed factual basis for this crime all under oath. Now he says that everything he said during the plea is false. In other words, he admits to being a perjurer. So, of course, that makes me doubly suspect of his credibility on the witness stand today. He's apparently quite willing to get on the witness stand, take an oath and lie under oath so long as it suits his purposes. So he has virtually no credibility at all.

(Ginther Hr'g Tr. at 41.)

Ultimately, said the court: "there was no ineffective assistance of counsel here. Quite the contrary. There was diligent assistance of counsel at every level and every stage by both lawyers. Mr. Davis' complaints about his lawyers are misguided, boarding on preposterous in this case frankly." (Ginther Hr'g Tr. at 41.) Accordingly, the Court "rejected" Davis's claim of ineffective assistance of counsel.

## C.

Davis filed a delayed application for leave to appeal in the Michigan Court of Appeals on December 19, 2012. He raised one issue: "Were Defendant's state and federal constitutional rights violated where his attorney was ineffective and coerced him to take a plea when he had a

7

valid defense?" (Dkt. 9-12, Br. in Supp. of Lv. to Appeal at 4.) In a one-line order, the Michigan Court of Appeals denied leave to appeal "for lack of merit in the grounds presented." (Dkt. 9-12, *People v. Davis*, No. 314024 (Mich. Ct. App. Feb. 12, 2013).)

### D.

On March 10, 2013, Davis filed a pro per application for leave to appeal in the Michigan Supreme Court, raising the same claim he had raised in the Michigan Court of Appeals. (*See* Dkt. 9-13, App. Leave to Appeal.) The Michigan Supreme Court denied Davis's application because it was "not persuaded that the question presented should be reviewed by this Court." *People v. Davis*, 494 Mich. 870, 832 N.W.2d 207 (2013).

### E.

Davis filed the petition for habeas corpus now pending before this Court on August 21, 2013. As he did in the state courts, Davis presents one claim: "Defendant's state and federal constitutional rights were violated where his attorney was ineffective and coerced him to take a plea when he had a valid defense." (Dkt. 1, Petition at 6.) Although Davis has asserted that his "attorney was" (not "attorneys were") ineffective, he does not specify which attorney he is referring to. But Davis's theory is that he was coerced to plead guilty. So the Court understands Davis's petition to be based on Gagniuk's conduct.

### II.

### A.

Before reaching the merits of Davis's habeas claims, the Court addresses a pair of related procedural questions. The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), and in particular, 28 U.S.C. § 2254(d), requires federal courts to give considerable deference to state-court adjudications of claims subsequently presented to a federal court as a basis for habeas

relief. *See Harrington v. Richter*, 562 U.S. ---, ---, 131 S. Ct. 770, 783, 786 178 L. Ed. 2d 624 (2011). But "[t]he language of 28 U.S.C. § 2254(d) makes it clear that this provision applies only when a federal claim was 'adjudicated on the merits in State court.'" *Johnson v. Williams*, ---U.S. ---, ---, 133 S. Ct. 1088, 1097, 185 L. Ed. 2d 105 (2013) (quoting § 2254(d)) (emphasis in original); *see also Robinson v. Howes*, 663 F.3d 819, 823 (6th Cir. 2011) ("Claims that were not 'adjudicated on the merits in State court proceedings' receive the pre-AEDPA standard of review: de novo for questions of law (including mixed questions of law and fact), and clear error for questions of fact."). Thus, two questions are threshold. First, did the Michigan courts decide Davis's habeas claim "on the merits" such that AEDPA deference applies? *See Johnson*, 133 S. Ct. at 1091 ("Because the requirements of § 2254(d) are difficult to meet, it is important whether a federal claim was 'adjudicated on the merits in State court' . . . ."); *Werth v. Bell*, 692 F.3d 486, 492 (6th Cir. 2012) ("At the threshold, we must decide which standard to apply to Werth's self-representation claim: de novo review or AEDPA deference."). And second, if § 2254(d) does apply, to which state-court decision should this Court defer under § 2254(d): the Michigan trial court's reasoned decision, the Michigan Court of Appeals' unexplained denial of leave to appeal "for lack of merit in the grounds presented," or the Michigan Supreme Court's unexplained denial of leave to appeal because it was "not persuaded" it should review the question presented? *See Barker v. Fleming*, 423 F.3d 1085, 1093 (9th Cir. 2005) ("[T]he Supreme Court describes AEDPA review as applying to a single state court decision, not to some amalgamation of multiple state court decisions.").

### 1.

A review of several key cases suffices to answer the first question. In a pre-AEDPA case, *Ylst v. Nunnemaker*, 501 U.S. 797 (1991), the Supreme Court was presented with the following

question: "whether the unexplained denial of a petition for habeas corpus by a state court lifts a state procedural bar imposed on direct appeal, so that a state prisoner may then have his claim heard on the merits in a federal habeas proceeding." *Id.* at 799. In concluding that the state courts had rejected the petitioner's claim based on a state procedural rule (the petitioner had raised his *Miranda* claim for the first time on appeal), the Supreme Court directed federal habeas courts to apply the following presumption: "Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." *Id.* at 803. Thus, a federal court should "look through the subsequent unexplained [state-court] denials to [the last reasoned state-court] opinion, unless [the petitioner] has carried his burden of adducing strong evidence that one of the subsequent courts reached the merits of the federal claim." *Id.* at 806.

Twenty years later and post-AEDPA, the Supreme Court was presented with the question of whether the deference set forth in § 2254(d) applied to an unexplained state-court denial of a (state) petition for habeas corpus. *Harrington v. Richter*, --- U.S. ---, ---, 131 S. Ct. 770, 783, 178 L. Ed. 2d 624 (2011). The Supreme Court in *Harrington* directed federal courts to presume that an unexplained state-court denial of a claim presented for federal habeas relief is a decision "on the merits" within the meaning of § 2254(d). 131 S. Ct. at 784-85. In reaching this conclusion, the Supreme Court acknowledged its decision in *Ylst*: "The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely. *See, e.g.*, *Ylst v. Nunnemaker*, 501 U.S. 797, 803, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991)." *Harrington*, 131 S. Ct. at 785.

Following *Harrington*, the Sixth Circuit applied the presumption that an unexplained state-court decision is nonetheless a decision "on the merits" to cases where, as here, the

10

Michigan Court of Appeals denies leave to appeal "for lack of merit in the grounds presented" and the Michigan Supreme Court, as here, denies leave to appeal because it is "not persuaded" that it should review the question presented. *Werth v. Bell*, 692 F.3d 486, 491, 493 (6th Cir. 2012). In so holding, the Sixth Circuit concluded that *Harrington* had abrogated its prior decision in *Dorn v. Lafler*, 601 F.3d 439 (6th Cir. 2010), which instructed the federal district courts in Michigan to presume that a Michigan Court of Appeals' denial of leave to appeal for lack of merit was *not* a decision on the merits (and thus, federal courts should review the petitioner's claims de novo). *See Werth*, 692 F.3d at 493 ("*Dorn* took precisely the opposite tack [as *Harrington*]."). The Sixth Circuit rejected the petitioner's argument that the Michigan Court of Appeals' denial of leave to appeal was merely "a decision not to decide," instead focusing on the state appellate court's statement that it had denied leave "for lack of merit in the grounds presented." *Werth*, 692 F.3d at 493-94 & n.10. Accordingly, as with the state-court denial of a habeas petition in *Harrington*, § 2254(d) presumptively applied to the Michigan Court of Appeals' summary order. *See also Hynes v. Birkett*, 526 F. App'x 515, 519 (6th Cir. 2013) ("[T]he order of the Michigan Court of Appeals denying Hynes's delayed application for leave to appeal 'for lack of merit in the grounds presented' was an adjudication 'on the merits' under AEDPA. The fact that the Michigan Supreme Court subsequently denied Hynes's application for leave to appeal 'because [it was] not persuaded that the questions presented should be reviewed by [that] [c]ourt' does nothing to negate AEDPA's applicability.").

A fourth case completes enough of the picture for this Court to answer the "on the merits" question. In *McClellan v. Rapelje*, 703 F.3d 344 (6th Cir. 2013) the warden, relying on *Werth*, argued that because the Michigan Court of Appeals had denied the petitioner's leave to appeal "for lack of merit in the grounds presented," § 2254(d) applied to the petitioner's habeas

11

claim. *Id.* at 348. The Sixth Circuit disagreed. Noting the district court's application of *Ylst* to "look through" the Michigan Court of Appeals' decision, the Sixth Circuit observed that the state trial court had applied a procedural bar and had not reached the merits of the petitioner's claim. *Id.* at 348-49. That fact, coupled with the fact that the Michigan Court of Appeals did not have the trial court record before it when it denied leave to appeal, meant that the petitioner had rebutted *Harrington*'s on-the-merits presumption. *Id.* at 350-51. De novo review of the petitioner's ineffective-assistance-of-counsel claim was therefore proper. *Id.*

Based on the foregoing cases, in answering the "on the merits" inquiry, this Court begins with the presumption that the Michigan Court of Appeals' denial of Davis's delayed application for leave to appeal "for lack of merit in the grounds presented" is a decision "on the merits" under § 2554(d). *See Harrington*, 131 S. Ct. at 784-85; *Werth*, 692 F.3d at 493. Then, in considering whether the presumption has been rebutted, this Court "look[s] through" the Michigan Court of Appeals' summary order to the state trial court's reasoned decision to determine if the trial court invoked a procedural bar in rejecting the habeas claim presented to this Court. *See Ylst*, 501 U.S. at 806; *McClellan*, 703 F.3d at 349 ("Our holding in *Werth* . . . requires analysis of the procedural history and factual underpinnings of each individual petitioner's case."). That review reveals that the state trial court unmistakably rejected Davis's ineffective-assistance-of-counsel claim on the merits and found that Davis had voluntarily pled guilty. And Davis offers no other evidence, e.g., the absence of the trial-court record before the Michigan Court of Appeals, that might rebut the on-the-merits presumption. Accordingly, § 2554(d) applies to Davis's habeas claim.

**2.**

The answer to the second question—should this Court review under § 2254(d) the Michigan Court of Appeals' *unexplained* (but still "on the merits") denial of leave and the Michigan trial court's *reasoned* (and also "on the merits") denial of Davis's motion to withdraw his plea?—is less settled. *Compare Sadler v. Howes*, 541 F. App'x 682, 687-89 (6th Cir. 2013) (giving AEDPA deference to Michigan Court of Appeals' summary order denying leave to appeal for lack of merit in the grounds presented even though the state trial court had "reviewed both affidavits and listened to each party's arguments" in denying an evidentiary hearing on the petitioner's ineffective assistance-of-counsel claim); *Cannedy v. Adams*, 706 F.3d 1148, 1176 (9th Cir. 2013) (Kleinfeld, J., dissenting) ("*Ylst* instructs courts to 'look through the subsequent unexplained denials to that [last reasoned] opinion, unless respondent has carried his burden of adducing strong evidence that one of the subsequent courts reached the merits of the federal claim.' *Richter* establishes that the California Supreme Court's decisions in this case were decisions on the merits, so there is no longer any need to 'look through' to the lower court decision." (internal footnote omitted)) *with Cannedy*, 706 F.3d at 1158 (majority opinion) ("[I]t does not follow from *Richter* that, when there is a reasoned decision by a lower state court, a federal habeas court may no longer 'look through' a higher state court's summary denial to the reasoning of the lower state court."); *Woolley v. Rednour*, 702 F.3d 411, 422 (7th Cir. 2012) ("*Harrington* addressed a scenario where . . . [t]here was no 'reasoned opinion' by any lower court on collateral review."). *Cf. Moritz v. Lafler*, 525 F. App'x 277, 283 n.3 (6th Cir. 2013) (noting, in dicta, that "[w]hile at first blush one might think that *Harrington* would abrogate the 'look through' required by [*Guilmette v. Howes*, 624 F.3d 286 (6th Cir. 2010) (en banc)] in favor of treating all M.C.R. 6.508(D) orders as merits-based, M.C.R. 6.508(D) orders are of a different

kind than those addressed in *Harrington*. . . . *Harrington* did not address state court orders like those made under M.C.R. 6.508(D) that, from the ambiguous language of the rule itself, allowed for the possibility of a procedural ruling in some circumstances and a merits-based decision in others.").

In this case, the Court need not, and does not, answer the question of which state-court opinion is entitled to AEDPA deference. Assuming that this Court should defer to the Michigan Court of Appeals' unexplained decision, *Harrington* teaches that this Court should do so by considering any possible explanation for the state appellate court's decision to deny leave to appeal for lack of merit in the grounds presented. *See Harrington*, 131 S. Ct. at 786 ("Under § 2254(d), a habeas court must determine what arguments or theories supported *or, as here, could have supported*, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." (emphasis added)). In considering all possible rationales supporting the Michigan Court of Appeals' summary order, this Court certainly may, and perhaps should, begin by considering the rationales provided in the state trial court's reasoned decision. *See Ylst*, 501 U.S. at 803 ("Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground."). In this case, as will be explained in detail below, applying § 2254(d) to the Michigan trial court's reasons precludes habeas relief. So, in this case, this Court's analysis is the same regardless of whether § 2254(d) applies to the Michigan Court of Appeal's summary denial of leave to appeal for lack of merit or the state trial court's reasoned denial of Davis's motion to withdraw his plea.

14

**B.**

Under § 2254(d), this Court "shall not" grant Davis habeas relief on his claim unless the Michigan trial court's adjudication of that claim resulted in a decision that was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A federal habeas court may grant the writ under the "contrary to" clause "if the state court arrive[d] at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court decide[d] a case differently than the Supreme Court has on a set of materially indistinguishable facts." *Hodges v. Colson*, 727 F.3d 517, 525 (6th Cir. 2013) (citing *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000)). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifie[d] the correct governing legal principle from the Supreme Court's decisions but unreasonably applie[d] that principle to the facts of the petitioner's case." *Id.* (citing *Williams*, 529 U.S. at 412-13). "'[C]learly established Federal law' for purposes of § 2254(d)(1) includes only 'the holdings, as opposed to the dicta, of [the Supreme] Court's decisions.'" *White v. Woodall*, --- U.S. ---, 134 S. Ct. 1697, --- L. Ed. 2d --- (2014) (quoting 28 U.S.C. § 2254(d); *Howes v. Fields*, 565 U.S. ---, ---, 132 S.Ct. 1181, 1187, 182 L.Ed.2d 17 (2012)).[1]

---

[1] The Court is aware that § 2254(e)(1) provides, "In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." But where, as here, § 2254(d)(2) applies, the interplay between §§ 2254(d)(2) and (e)(1) is unsettled. *See Wood v. Allen*, 558 U.S. 290, 293 (2010) ("We granted certiorari to address the relationship between §§ 2254(d)(2) and (e)(1). We conclude, however, that the state court's factual determination was reasonable even under petitioner's reading of § 2254(d)(2), and therefore we need not address that provision's relationship to § 2254(e)(1).");

The foregoing standards make clear that § 2254(d) deference is significant: "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 131 S.Ct. at 786-787. "'If this standard is difficult to meet'—and it is—'that is because it was meant to be.'" *Burt v. Titlow*, --- U.S. ---, 134 S. Ct. 10, 15-16, 187 L. Ed. 2d 348 (2013) (quoting *Harrington*, 131 S.Ct. at 786-787).

## C.

One more legal standard is applicable here: the holdings in *Hill v. Lockhart*, 474 U.S. 52 (1985), and *Strickland v. Washington*, 466 U.S. 668 (1984), supply the "clearly established Federal law, as determined by the Supreme Court of the United States." Davis asserts that his guilty plea was involuntary. But the entire basis for that assertion is that Gagniuk was allegedly "ineffective and coerced [Davis] to take a plea when he had a valid defense." (Petition at 6.) As such, "the voluntariness of [Davis's] plea depends on whether counsel's advice 'was within the range of competence demanded of attorneys in criminal cases.'" *Hill*, 474 U.S. at 56 (quoting *McMann v. Richardson*, 397 U.S. 759, 771 (1970)). This in turn means that the familiar test set forth in *Strickland* applies to Davis's claim. *Hill*, 474 U.S. at 57-58; *see also Rinckey v. McQuiggan*, 510 F. App'x 458, 460-61 (6th Cir. 2013).

---

*Rice v. White*, 660 F.3d 242, 254 (6th Cir. 2011) ("It is an open question whether 28 U.S.C. § 2254(e)(1) . . . applies in every case presenting a challenge under § 2254(d)(2)." (internal quotation marks omitted)); *Murray v. Schriro*, 745 F.3d 984, 1001 (9th Cir. 2014) ("Since [*Kesser v. Cambra*, 465 F.3d 351 (9th Cir. 2006)], our panel decisions appear to be in a state of confusion as to whether § 2254(d)(2) or (e)(1), or both, applies to AEDPA review of state-court factual findings."). Because it does not affect the outcome, the Court will assume, without deciding, that only § 2254(d)(2) applies.

For Davis to succeed under *Strickland*, he must show both deficient performance and prejudice. *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009). Regarding performance, "[t]o be deficient, counsel's representation must have fallen 'below an objective standard of reasonableness,' *Strickland*, 466 U.S. at 688, 104 S.Ct. 2052; and there is a 'strong presumption' that counsel's representation is within the 'wide range' of reasonable professional assistance, *id.*, at 689, 104 S.Ct. 2052." *Harrington*, 131 S. Ct. at 778. Davis must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. As for prejudice, in the plea context a petitioner must show "a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill*, 474 U.S. at 59.

## D.

In sum, "[t]he standards created by *Strickland* and § 2254(d) are both highly deferential." *Harrington*, 131 S.Ct. at 788 (internal citations and quotation marks omitted). And where, as here, both § 2254(d) and *Strickland* apply, the Court's review is "doubly" deferential to state court decisions. *Id.* Thus, the question is not merely whether Gagniuk's decisions were reasonable. *See id.* at 788. Rather, the question is whether the state trial court unreasonably concluded that his decisions were reasonable. *See id.*

With all of the foregoing legal standards firmly in mind, the Court turns to the merits of Davis's petition.

## III.

## A.

Attached to Davis's Petition is the brief he filed in the Michigan Court of Appeals. That brief asserts that Davis's arrest was unconstitutional, that Davis was detained without probable

17

cause for an unconstitutionally-long four-day period, and that there were several problems regarding the victims' identification of Davis as one of the perpetrators. (Petition at 35-38.) In his reply brief in support of his Petition, Davis implies that absent his illegal detention, his brother's girlfriend would not have gone to the police station and given a statement implicating him. (Dkt. 11, Pet.'s Reply at 4.) And, absent her statement, he would not have been compelled to appear at his preliminary exam. (*Id.* at 5.) And, at the exam, his appearance at counsel table in prison garb unduly suggested to the victims that he was one of the perpetrators. (*Id.* at 5.)

Davis links these assertions to an ineffective-assistance-of-counsel claim as follows. He says that counsel "wrongfully advised" him to plead guilty before the trial court decided a pending motion challenging the lawfulness of his arrest and detention. (Pet.'s Reply at 6.) Davis says that had counsel pursued that motion, the court may have suppressed the statement that his brother's girlfriend provided. (*Id.* at 7.) Davis also faults his counsel for failing "to challenge the suggestive identification procedures prior to the day set for trial" and for failing to obtain a mug shot that would have shown him to be without facial hair. (*Id.* at 8.) Davis further claims that Gagniuk was not prepared for trial. (*Id.* at 7.) In sum, says Davis, he was "forced to cho[o]se between the less[er] of two evils: He could proceed to trial with a negligent attorney, who had already shown that he was not concerned with properly litigating Mr. Davis's case, or Mr. Davis could plead guilty and receive a significant reduction in the amount of time he was destined to receive had he proceeded to trial with his incompetent attorney." (*Id.*)

The Court addresses each of these arguments below. None demonstrate that the state trial court unreasonably concluded that Gagniuk was not constitutionally ineffective as counsel.

18

**B.**

Beginning with Davis's claim that Gagniuk's performance was deficient because he would not pursue a pending motion asserting unlawful arrest and detention, Davis has not established a necessary premise of that argument: that Gagniuk in fact refused to pursue the motion or advised Davis to instead plead. True, at one point during the *Ginther* hearing, Gagniuk suggested that he did not plan to pursue the motion: "And I, I honestly I cannot recall whether or not I looked through [the motion Posner had filed], did anything more with it. Obviously I didn't continue to argue that." (Ginther Hr'g Tr. at 9.) But elsewhere he indicated that he was prepared to argue the motion had Davis not decided to plead guilty:

> Q. And if there was a motion that was prepared and ready, would you have been prepared and ready to do it that morning of trial?
>
> A. I could have done everything and anything on that day, absolutely. I was ready to go.

(Ginther Hr'g Tr. at 18.) Further, Gagniuk testified that it was Davis who had requested a plea: "if I recall correctly, on [the] day of trial [Davis] was seeking a certain number in terms of years to settle this matter." And Gagniuk left the ultimate decision with Davis, "It's [the defendants'] call on whether they want a trial or not, but I always make sure they know the consequences. And [Davis's] guidelines were through the roof. . . . I looked at this and I told him you got a tough ass case. Do what you want. Here's your numbers. I can get you 11 on the primary. Take it or leave it, and he took it." (Ginther Hr'g Tr. at 11, 22.) Davis said that this testimony was false, but the state trial court found that it was Davis's testimony that was not credible. (*Id.* at 40.) That determination was not unreasonable. In taking Davis's plea, the court asked Davis, "has anybody promised you anything else or threatened you or twisted your arm in any way to get you to give up your rights and plead guilty?" (Plea Hr'g Tr. at 6.) Davis's answer: "No, sir." (*Id.*)

19

Accordingly, the record does not support Davis's claim that Gagniuk had refused to pursue the motion or that he told Davis that he should plead guilty instead of pursuing the motion.

And even if Gagniuk had given Davis this advice, Davis has not shown that it was objectively unreasonable under the standard set forth in *Strickland*. There was likely a colorable argument that the ATM photo did not permit identification. (*See* Dkt. 9-5, Final Conf. Tr. at 14.) And it is not clear how officers ultimately found and arrested Davis. Indeed, Posner had argued that Kurkowski's vehicle was found many blocks from the house where officers arrested the brothers. (Final Conf. Tr. at 12.) Further, based on Posner's questioning of Kurkowski during the preliminary exam, Kurkowski might have told police that the person he later identified as Davis had facial hair (*see* Prelim. Exam Tr. vol. I at 29, 35), and Davis maintains that his mug shot shows he had no facial hair. It is also not clear what description Lach gave to the police, but during her preliminary exam testimony, she did have difficulty identifying Davis. (*E.g.*, Prelim. Exam Tr. vol. I at 48, 50.) Moreover, the individual ultimately identified as Davis wore a mask during some parts of the robbery. (*See e.g.*, Prelim. Exam Tr. vol. I at 33.)

On the other hand, Gagniuk had reasons not to pursue the motion. He would have known that Kurkowski had testified that he had been detained by Davis and his brother for over an *hour*. (Prelim. Exam. Tr. vol. I at 25.) Based on this, Gagniuk might well have thought that the court would find that Kurkowski and Lach had provided the police with accurate descriptions of their captors. Indeed, Kurkowski testified that he spoke with the police within a few hours of the incident, while it was still "fresh" in his mind. (*Id.* at 29.) Kurkowski was able to give the police a description of the suspect's hat, jacket, pants, approximate age, height, and skin color. (*Id.* at 27-30.) More importantly, Gagniuk had to weigh the benefits of pursuing the motion against the cost: having the motion denied and the prosecutor's offer souring. Indeed, Davis himself

20

testified, "[Gagniuk] came to me on the day of the trial and the evidential hearing and stated to me that the negotiation was 11 plus five. And then he stated to me again if I didn't go right, if I didn't take it right now, and if I want to [go forward with] the evidential hearing, it would go up two years." (Ginther Hr'g Tr. at 26.)

In all, even if Gagniuk decided not to pursue the motion or advised Davis to instead accept a plea bargain, Davis has not shown that Gagniuk's decision or advice was an "error[] so serious that [Gagniuk] was not functioning as the 'counsel' guaranteed [to Davis] by the Sixth Amendment," *Strickland*, 466 U.S. at 687. And even if Davis could clear that hurdle, he has not shown that the state court's implicit finding that Gagniuk's decision not to pursue the motion was contrary to, or an unreasonable application of *Strickland* and *Hill*. (*See* Ginther Hr'g Tr. at 41 ("There was diligent assistance of counsel at every level and every stage by both lawyers. Mr. Davis' complaints about his lawyers are misguided, boarding on preposterous in this case frankly.")); *cf. Johnson*, 133 S. Ct. at 1094 ("[B]ecause it is by no means uncommon for a state court to fail to address separately a federal claim that the court has not simply overlooked, we see no sound reason for failing to apply the *Richter* presumption in cases like the one now before us.").

## C.

As for Davis's claim that Gagniuk failed to challenge the preliminary-exam identification procedures, any such motion would have been even less likely to succeed. Davis's claim is that because he was sitting at counsel table dressed in prison garb during the exam, Kurkowski and Lach were more likely to identify him as one of the perpetrators. But Gagniuk's failure to make that argument must be viewed in light of the fact that Davis's first counsel, Posner, had already made a nearly identical argument without success. At the conclusion of the preliminary exam,

Posner argued that Davis and his brother were "the only African [m]ales also young people sitting in the courtroom," that it had been a month between the incident and the preliminary-examination identifications, and that "[w]e all know what the taint can be in terms of an in court identification." (Prelim. Exam Tr. vol. II at 28-29.) The preliminary-examination judge did not find these arguments persuasive and concluded that there was probable cause that Davis had committed the crime. (*Id.* at 34.) Under Michigan law, the circuit court where Davis was set to be tried would have owed deference to this probable-cause determination. *See People v. Neal*, 201 Mich. App. 650, 654, 506 N.W.2d 618, 620 (1993). Given all of this, Gagniuk was quite unlikely to succeed in challenging the victims' in-court identifications. As such, he was not constitutionally ineffective for not doing so. *See Jacobs v. Sherman*, 301 F. App'x 463, 470 (6th Cir. 2008) ("[F]ailing to make a futile motion is neither unreasonable nor prejudicial").

### D.

Turning to Gagniuk's alleged failure to obtain Davis's mug shot, Davis has not shown how this prejudiced his case within the meaning of *Strickland*'s two-part test.[2] Although neither Kurkowski's description to the police nor the mug shot are part of the Rule 5 materials, the Court will assume in Davis's favor that Kurkowski told police that Davis had a goatee and mustache, whereas the mug shot would have shown otherwise. Davis's claim is nonetheless problematic

---

[2] It is not clear whether the state trial court adjudicated the prejudice prong of *Strickland*. Assuming in Davis's favor that the state trial court did not, and further assuming in Davis's favor that this Court is not reviewing the Michigan Court of Appeals' summary order under the any-possible-rationale standard set forth in *Harrington*, this Court will evaluate prejudice de novo. *See Rayner v. Mills*, 685 F.3d 631, 638 (6th Cir. 2012) ("When a state court relied only on one *Strickland* prong to adjudicate an ineffective assistance of counsel claim, AEDPA deference does not apply to review of the *Strickland* prong not relied upon by the state court. The unadjudicated prong is reviewed de novo."). Notably, where a state trial court addresses only the performance prong of *Strickland*, but the state appellate court denies, on the merits, leave to appeal, is a situation where it may be critical for a federal court to determine which state-court decision to review under § 2254(d). *See supra* Part II.A.2.

because, at the preliminary examination, Kurkowski described Davis as *not* having facial hair and unequivocally denied that he said anything different to the police. (Prelim. Exam vol. I at 35.) Kurkowski would have been expected to testify this way at trial, in which case, the mug shot would have done little to undermine his testimony. And nothing suggests that Gagniuk would not have pursued impeachment of Kurkowski with the police report (if it in fact reflected that Kurkowski described the person later identified as Davis as having facial hair). Davis has thus not shown that there is a reasonable probability that he would not have pled guilty had Gagniuk obtained the mug shot. *See Hill*, 474 U.S. at 59.

## E.

Davis also asserts that his "habitual" status was incorrect, and that Gagniuk did not make the correction from Fourth Habitual Offender to Third Habitual Offender until after he had pled guilty. (*See* Petition at 37.) This designation is significant because a Third Habitual Offender's upper limit on his minimum sentence range is increased by 50% whereas a Fourth Habitual Offender's upper limit on his minimum sentence range is increased by 100%. *See* State of Michigan, Sentencing Guidelines Manual at 10 (last updated May 2014), *available at* http://goo.gl/5dl7Ct.

It is true that while Gagniuk and Ehlfeldt were negotiating the terms of Davis's plea agreement, they were both under the impression that with the current charges, Davis would be a Fourth Habitual Offender. This is evidenced by Ehlfeldt's explanation of the plea bargain to the trial court:

> Your Honor, . . . this would be his second felony firearm, so it's a felony firearm second offense carrying a mandatory five years. The remaining offenses are all life offenses.
>
> I should say the robbery and carjacking are life offenses. The home invasion first is punishable ordinarily by 20 years. However, the defendant is also pleading as a

habitual fourth offender increasing the maximum for all the offenses except for the felony firearm to life.

(Plea Hr'g Tr. at 3-4.)

Even so, Davis overlooks the fact that Gagniuk stated on the record at the plea hearing, and then again at the *Ginther* hearing, that Davis's habitual status did not affect the plea negotiations. (Plea Hr'g Tr. at 14; Ginther Hr'g Tr. at 17.) This is plausible since it appears that Davis was facing a long prison sentence regardless of whether he was a Third or Fourth Habitual Offender:

> THE COURT: And actually he could have been facing even additional consecutive sentences, not just the five year felony firearm. And then on carjacking, home invasion, and armed robbery, there's consecutivity allowed as well.
>
> MR. EHLFELDT: That's correct, your Honor.
>
> And he could have conceivably faced guideline sentences on a robbery armed which would have been consecutive to a guideline sentence on home invasion first which would have been consecutive to carjacking sentence which would have then been consecutive to the five year offense.
>
> MR. GAGNIUK: We're well aware of that. Any conviction could have doubled, maybe tripled this over.
>
> THE COURT: Yeah. He might never have seen the light of day, right. You worked out a good deal for him here.

(Plea Hr'g Tr. at 3-4.) And Davis has produced no evidence to undermine Gagniuk's testimony that Davis's habitual status did not affect the plea negotiations.

In any event, given the nature of Davis's habeas claim, the proper inquiry is whether, absent Gagniuk's unprofessional errors, there is a reasonable probability that Davis would have proceeded to trial. *See Hill*, 474 U.S. at 59. But if Gagniuk and Ehlfeldt had considered Davis as a Third Habitual Offender instead of a Fourth, Davis's plea deal certainly would not have been worse than it was. And if Davis's plea deal had been more favorable to him, it is *less* likely that

24

he would have proceeded to trial. Accordingly, Davis has not shown how, absent Gagniuk's error, there is a reasonably probability that he would have elected trial.

**F.**

Finally, Davis's claim that Gagniuk was not prepared for trial was flatly rejected by the state trial court:

> I am happy to say it, it appears to me that Mr. Gagniuk was fully prepared to try the case two weeks from the day he was appointed. . . . . And there was no ineffective assistance of counsel here. Quite the contrary. There was diligent assistance of counsel at every level and every stage by both lawyers.

(Ginther Hr'g Tr. at 40-41.) AEDPA deference applies to this conclusion, and the Court does not find it unreasonable given that Gagniuk repeatedly testified that he was fully prepared for trial. (Ginther Hr'g Tr. at 10, 16, 18, 19.)

* * *

According to Davis's counsel, the prosecutor, and the state trial court, Davis was given a favorable plea deal. Davis now believes he would have done better had he proceeded to trial. But Davis has not shown that Gagniuk provided constitutionally deficient representation such that he was forced to forgo trial. Nor has he shown, as is required for a writ of habeas corpus where § 2254(d) applies, that the state court's finding that Gagniuk was not constitutionally ineffective was "contrary to," or an "unreasonable application of" *Strickland* as applied to the plea context in *Hill*. Accordingly, the Court will deny Davis's petition.

**IV.**

Before Davis may appeal this Court's dispositive decision, "a circuit justice or judge" must issue a certificate of appealability. *See* 28 U.S.C. § 2253(c)(1)(A); Fed. R. App. P. 22(b). A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Because the Court has rejected Davis's

25

habeas claim on the merits, to satisfy § 2253(c)(2), Davis must show "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (internal quotation marks and citation omitted). Given that the foregoing analysis of Davis's claim is rather straightforward, the Court believes that no reasonable jurist would argue that Davis should be granted habeas relief on his claim. Accordingly, a certificate of appealability will not issue from this Court.

**V.**

For the foregoing reasons, the Court DENIES Davis's Petition for Writ of Habeas Corpus and DENIES Davis a certificate of appealability.

SO ORDERED.

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE

Dated:  July 3, 2014

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on July 3, 2014.

s/Jane Johnson
Case Manager to
Honorable Laurie J. Michelson